**MICHIGAN ASSOCIATION FOR RETARDED CITIZENS, a non-profit Michigan Corporation, Plymouth Association for Retarded Citizens, a non-profit Michigan Corporation, David Bentley, by his next friend Sue Hickman, Andrew Foster, by his next friend Joseph G. Johnson, Laurie E. Healey, by her next friend Laura Healey, John Jay Hovey, by his next friend Lenore E. Hovey, Buddy Rae Nelson, by his next friend Jimmie N. Nelson, Carl Joseph Panicali, by his next friend Eileen Panicali, Mary Sabo, by her next friend Francis Sabo, Wendy Sampson, by her next friend Robert J. Sampson, Carolyn Szczesiul, by her next friend Mary Finn, Christine Wojtowycz, by her next friend Emilian Wojtowycz, on their behalf and all 'others similarly situated, Plaintiffs,**

v.

**Donald C. SMITH, M. D., Individually and in his former official capacity as Director, Michigan Department of Mental Health, Vernon A. Stehman, M. D., Individually and in his official capacity as Acting Director, Michigan Department of Mental Health, Don K. Worden, Ph. D., Individually and in his official capacity as Regional Director, Michigan Department of Mental Health, William C. Womack, Individually and in his former official capacity as Director, Plymouth Center for Human Development, Evelyn Provitt, R.N., M.S., Individually and in her former official capacity as Acting Director, Plymouth Center for Human Development, David Rosen, Individually and in his former official capacity as Acting Director, Plymouth Center for Human Development, Eranell McIntosh-Wilson, Individually and in her official capacity as Director, Plymouth Center for Human Development, their agent, employees and successors, Defendants.**

Civ. A. No. 78–70384.

United States District Court,
E. D. Michigan,
Southern Division.

Aug. 30, 1979.

William J. Campbell, Michael J. Kiley, Brian J. O'Malley, David Verseput, Michi-gan Protection and Advocacy Service for Developmentally Disabled Citizens, Lansing, Mich., for plaintiffs.

Thomas R. Wheeker, Lansing, Mich., for defendants.

## MEMORANDUM OPINION, ORDER AND DECREE

JOINER, District Judge.

On February 21, 1978, the Michigan Association for Retarded Citizens, the Plymouth Association for Retarded Citizens, and twelve individuals brought this suit against various officials in the Michigan Department of Mental Health in an attempt to improve the plight of the mentally retarded persons who were residents of the Plymouth Center for Human Development.

The suit followed a number of charges of abuse of the residents, mismanagement of the institution, and misdirection of the Department of Mental Health in the care and treatment of mentally retarded persons.

On March 3, 1978, this court officially recognized the case as a class action, noting that the named plaintiffs were representatives of all of the residents of the Plymouth Center. Also on March 3, 1978, the court entered a preliminary injunction, the substance of which had been agreed to between the parties. This injunction halted new admissions to the center, compelled compliance with federal standards for staff-to-patient ratios, assured relatives greater access to residents, ordered the separation of aggressive and defenseless residents, ordered the center to set up a system of staff accountability in which each resident would be the direct responsibility of a particular staff member, and guaranteed annual physical and mental examinations for all residents. In addition, the injunction created a group of monitors who have spent a great deal of time observing at the center and who have reported to the court on their observations.

In their seventeen monthly reports, the monitors have convinced the court that

enormous progress has been made in the care and treatment of the residents of the center. This progress has been the result of the efforts of the parties to this case, their attorneys, and many other people who have shown an interest in the problems that have existed at the center.

Now, after much investigation and long negotiations, the parties have entered into a stipulation concerning the future of the Plymouth Center. This order, judgment, and decree is entered into in accordance with that stipulation.

## PARTIES, JURISDICTION, AND PURPOSE

1. Plaintiffs are the Plymouth Association for Retarded Citizens (hereinafter, PARC), the Michigan Association for Retarded Citizens (hereinafter, MARC), individuals named as plaintiffs and a class of plaintiffs consisting of:

a. All persons who resided at PCHD on the date the complaint herein was filed, February 21, 1978;

b. all persons who have resided at PCHD at any time since the date of the filing of the complaint, February 21, 1978;

c. all persons listed on the patient census filed with the Court who may in the future reside at PCHD provided, however, that such persons do not become members of the class until such time as they are physically residing at PCHD; and

d. all persons transferred to PCHD and meeting the provisions of paragraph eight (8) of this agreement.

PROVIDED THAT any person who has or in the future is transferred outside of Wayne County at the request of a parent or guardian, who resides outside of Wayne County, shall no longer be considered a member of the plaintiff class. This provision shall not apply to any named plaintiff. They bring this action pursuant to, *inter alia*, 42 U.S.C. § 1983, claiming violations of the constitutional and statutory rights of persons who are or may be institutionalized at PCHD, and seeking for such persons habilitation of appropriate, less restrictive residential alternatives suitable to their needs. Defendants are the administrative officials with the Michigan Department of Mental Health charged with the responsibility for providing the members of the Plaintiff class with mental health services.

2. This Court has jurisdiction of the subject matter of this class action, pursuant to, *inter alia*, 28 U.S.C. § 1343(3), 42 U.S.C. § 1983, 42 U.S.C. § 6010, and the Fourteenth Amendment to the United States Constitution; this class action is appropriately designated as coming within the provisions of Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

3. Jurisdiction is retained by the Court until this Decree has been fully implemented, to enable any party to apply for such further orders as may be necessary or appropriate for the interpretation, implementation, enforcement, or modification of the terms of this Decree, as provided for by the terms of this Decree.

4. This Decree shall be as binding on the Defendants' successors, officers, agents and employees as on the Defendants themselves. Defendants and their successors will take actions necessary to secure and are responsible for full implementation of this Decree, including coordinating with other agencies and officials of the state of Michigan and other governmental entities the carrying-out of responsibilities necessary to the implementation of this Decree.

5. The parties and the Court deem this Decree to be pertinent for the final settlement of the case; to the extent current information renders final, substantive settlement of an issue impracticable, the parties agree to collaborate and negotiate and to seek direct judicial resolution only as a last resort, and as provided by the terms of this Decree.

6. The Preliminary Injunction agreed to March 3, 1978, by the parties, is no longer binding and no longer has the force and effect of law.

7. Based upon the record and consideration of submissions by the parties and the Monitoring Committee established by this Court in conjunction with this case, this Decree may be entered by the Court and is consented to by the parties for the purpose of establishing a commitment to the development of a comprehensive system of appropriate, less restrictive treatment, training, and support services for each member of the Plaintiff class. All mentally retarded individuals can and should live in the more normalized environment of the community and do not require institutionalization, given the development of necessary habilitation and support services in the community.

## PLYMOUTH CENTER FOR HUMAN DEVELOPMENT

8. Defendants agree to halt new admission of residents to the PCHD. A new admission is defined as the admission of a person whose name does not appear on the 'patient census' and is not on a leave status from the PCHD as of the date of entry of this Decree. Defendants may transfer residents of other Department of Mental Health institutions for the developmentally disabled to PCHD for purposes of effecting or preparing for a community placement in Wayne County, provided that transfers will be made to PCHD only in numbers equivalent to or less than the actual placements into the community of class members. No such transferred resident will be counted in determining Defendants' compliance with paragraph nineteen (19) of this Decree until forty-five (45) days have elapsed from the date of such transfer to the PCHD; similarly, no such person will be considered a member of the Plaintiff class until said forty-five (45) day period has elapsed, and only in the event such person is still a resident of the PCHD.

9. Defendants agree to maintain on all PCHD living units a direct care staff-to-resident ratio which meets the standards of the United States Department of Health, Education and Welfare for certification of an institution as an intermediate care facili-

ty for the mentally retarded. Further, with respect to Malloy, Kennedy, Sullivan and Binet Halls, such ratio will be maintained as follows: on the day and afternoon shifts one (1) direct care staff person to four (4) residents, and on the midnight shift one (1) direct care staff to eight (8) residents. The staffing provided for in this paragraph means that such staff shall be physically present on the ward or living unit in sufficient numbers in relation to the residents actually on the ward or living unit to maintain the ratios set forth by this paragraph. In the event residents are transferred from any of the buildings identified above and such transfer is occasioned by reasons other than a change in the resident's condition, such a resident shall continue to benefit from the more favorable staff-to-resident ratio. In the event living units located in the buildings identified above come to be inhabited by residents whose general programmatic needs are dissimilar from those of current residents, such units may employ the more conventional staffing patterns.

10. Defendants are required to provide for the residents of PCHD such adequate habilitation as will afford a reasonable opportunity for them to acquire and maintain such life skills as are necessary to enable them to cope as effectively as their capacities permit. Habilitation programs will be based on Individual Program Plans developed for each member of the Plaintiff class. The Master provided for herein will have access to all information, records, residential environments and PCHD program areas, and will be permitted to interview any person affected by or involved in the implementation of this Decree, to the extent necessary to discharge his/her duties under this Decree.

## CREATION AND MAINTENANCE OF COMMUNITY PROGRAMS

11. The following principles form the basis for creating and maintaining the comprehensive system of community mental health and retardation services suitable to meet the needs of all members of the Plaintiff class:

a. A comprehensive community mental health and retardation system consists of three distinct components: (1) residential environments which are the least restrictive and most normal settings appropriate for each resident or client; (2) nonresidential habilitation, training, and support programs which are geographically separate from community residences and which provide the major daily activity for those clients; and (3) management services to adequately develop, coordinate, administer, monitor, and evaluate this network of environments and programs.

b. Residents and clients are entitled to live in the least restrictive, most normal residential alternative and to receive appropriate habilitation, training, and support suited to their individual needs.

c. The provision of appropriate habilitation, training, and support services to PCHD residents will not deprive other persons currently receiving mental health or retardation services from the Defendants from continuing to receive such services for as long as they are determined to be necessary, according to professionally accepted standards.

d. The determination of client service needs will occur through an individualized screening, evaluation, and service planning process, including annual reviews of Individual Program Plans.

e. The determination of the appropriate residential and nonresidential placement for each resident and client will be made so as to guarantee that all persons are placed in the least restrictive alternative which will provide them with appropriate habilitation, training, and support; smaller residential alternatives are preferred to larger ones. Defendants agree that they will not place members of the class in new residences having more than an eight (8) bed capacity except as provided herein. Such new residence is one not previously utilized for placement by the PCHD or the community mental health board. Members of the class may be placed in new or existing nursing homes exceeding eight (8) beds in lieu of adequate, available alternatives where the condition of the resident warrants and subject to prior review by the Master.

f. Community residential and nonresidential services will be offered, to the extent needed and with due regard for each client's dignity and personal autonomy; residents and their parents, guardians, or advocates, will participate in the community placement process and they will be advised of their rights to an administrative appeal when, and only when, they object to a residential placement because the placement is in an inadequate facility or a facility which is too restrictive, or because the proposed placement does not provide appropriate programmatic services.

g. All residential and nonresidential services will be offered by providers of services on a nondiscriminatory basis, without regard to a resident's or client's ability to pay.

h. Community residential alternatives and nonresidential programs will be integrated in the community and operated in the most normal manner appropriate to the needs of their clients.

i. An evaluation process is required to assess a program's quality and effectiveness in meeting the needs of its clients. Defendants will have six (6) months to develop such a process.

j. It is recognized that a small percentage of mentally retarded individuals may require intervention in an inpatient facility due to the unavailability of community alternatives. They include medically fragile individuals requiring constant medical life support monitoring and those individuals who, although not mentally ill, exhibit behavior which could result in their being judicially admissible under § 515 of the Mental Health Code.

k. Adequate residential and nonresidential services will be provided in appropriate, less restrictive alternatives to all residents and clients for as long as determined necessary to meet their individual needs, according to professionally acceptable standards.

12. The Defendants, their agents and contractees, will create and maintain appropriate community residential alternatives and nonresidential programs, including necessary management services, for all members of the Plaintiff class adequate to meet their individual needs as recommended in their Individual Program Plans. It is recognized by the parties that the community mental health board also has the authority to create and maintain such alternatives and programs, and the Defendants may utilize the resources and programs of the community mental health board, its agencies and contractees, in carrying out the terms of this Decree. The Director of the Department of Mental Health has the ultimate responsibility for carrying out the provisions of this Decree.

13. The Defendants will, subject to paragraph fourteen (14) herein, maintain and continue to fund as appropriated new and existing programs necessary to carry-out this Decree, unless the needs of the residents and clients, as determined by their Individual Program Plans, no longer require such programs.

14. The Defendants will use their best efforts to insure the full and timely financing of this Decree, including: submission of appropriate budget requests; allocation of sufficient funds as appropriated to insure that all existing and new programs necessary to carry-out the provisions of this Decree meet the minimum standards herein; full allocation of funds appropriated for services during the fiscal year; and, allotments of appropriated funds as needed. In order to finance the obligations of this Decree, the Defendants agree not to transfer funds among accounts in such a way as to reduce the level of services presently being provided to PCHD residents. As used in this paragraph the word "allocate" means to designate or earmark appropriated funds for specific purposes, consistent with appropriations acts enacted by the Michigan legislature.

15. The Defendants will not place residents or clients in residential alternatives or nonresidential programs which fail to meet applicable environmental, care, and programming standards.

16. Within the framework of the provisions of this Decree, the parties agree that the Defendants should have reasonable flexibility in implementing residential and nonresidential programs.

17. The Defendants agree to take all necessary action to insure full and timely compliance with the provisions of this Decree. The parties recognize that there may arise, during the implementation of this Decree, difficulties beyond the control of the Defendants which may inhibit timely accomplishment of certain of its terms. Whenever one of the parties or the Master, whose role is created herein, determine that such difficulties have arisen and significantly threaten implementation, the problem may be brought to the Court's attention, pursuant to the procedure established in paragraph forty-three (43) herein.

18. The time schedule hereafter set forth establishes target dates, and Defendants agree to make every good faith effort to accomplish meeting them during the times specified; Defendants agree to undertake such efforts as are necessary to ameliorate the effects of community and parental resistance to their program for community placement. Plaintiffs MARC and PARC will support Defendants' efforts in this regard.

19. In accordance with paragraph seven (7) herein, the parties agree that Defendants will create small scale community residential services of sufficient quantity and quality as will allow for reduction in the resident population of the PCHD to a maximum of five-hundred, sixty (560) as of March 31, 1980, and as required to meet the following schedule:

|  | Maximum PCHD Census | Residents Placed in the Community |
|---|---|---|
| September 30, 1980 | 500 | 60 |
| March 31, 1981 | 440 | 60 |
| September 30, 1981 | 370 | 70 |
| March 31, 1982 | 280 | 90 |
| September 30, 1982 | 190 | 90 |
| March 31, 1983 | 100 | 90 |

20. After March 31, 1983, the PCHD will not exceed a population of one-hundred (100) developmentally disabled persons. In implementing this Decree, Defendants will not, directly or indirectly, designate any resident of PCHD as likely to remain beyond March 31, 1983, but rather will plan for and use their best efforts to seek an appropriate community residence for all residents of PCHD by January 1, 1984. Continued residency at PCHD of members of the plaintiff class after January 1, 1984 will be subject to review by the Master pursuant to paragraph twenty-one (21) and forty-one (41).

21. In accordance with the philosophy expressed in paragraph seven (7) herein, the parties agree that Plaintiffs may object to the continued residency of any resident at the PCHD and may have any case reviewed by a person of their choosing who is familiar with the community placement process. The Master provided for herein will have the final decision-making authority in any disputed case, subject to the provision of paragraph forty (40) herein.

22. When the population of the PCHD reaches one-hundred (100) residents, the Defendants will continue to use their best efforts to place the remaining residents in the community. In the case of some medically fragile residents, who require constant medical life support monitoring, or those residents exhibiting behaviors which could result in their being judicially admissible under § 515 of the Mental Health Code, appropriate community placements may not be immediately available. Defendants may continue to provide care and habilitation to such residents at the PCHD, provided that Plaintiffs may object to the continued residency and may have any case reviewed by a person of their choosing who is familiar with community placement and the available alternatives. The Master will have the final decision-making authority in any disputed case, subject to the provisions of paragraph forty-one (41) herein.

23. After March 31, 1983, the PCHD will not exceed a residential population of one-hundred (100) developmentally disabled persons. None of the remaining PCHD population will be long term residents. Though Defendants may admit those types of persons described in the preceding paragraph when the resident census falls below one-hundred (100), such admissions will be subject to the review of the Master and will be allowed until, and only until, appropriate community placements are developed.

24. Recommendations as to residential and nonresidential program placements will be based on an evaluation of the actual needs of the resident or client rather than on what programs are then currently available. In cases where the services needed by a client are unavailable, the Individual Program Plan will provide an interim program based on available services which meet, as nearly as possible, the actual needs of the client. The number of clients in need of a service or program which is not then currently available and information respecting the types of residential alternatives or non-residential programs which they need will be compiled by Defendants in order to plan for the further development of programs.

25. As soon as it is practicable and to the extent not inconsistent with existing contracts, the Defendants will reach a written agreement with the operators of community residences and nonresidential programs to include the following:

a. require the residence or program to comply with the applicable terms of this Decree and with all applicable statutes, rules, and regulations promulgated by the United States, the state of Michigan, and the Department;

b. reserve the right of employees, agents, and contractees of the Department of Mental Health to have reasonable access to the residence or program and to audit its records, to monitor services to its clients, and to cancel the contract, remove the resident or take other remedial action in the event the provider substantially fails to fulfill the terms of the contract.

c. require the facility to have an appropriate representative participate in the Individual Program Plan process for each of its clients;

d. require substantial fulfillment of the applicable portions of each client's Individual Program Plan.

Sanctions for failure to comply with the provisions of this Decree will be included in the agreement and will include, but will not be limited to, the termination of the agreement and the removal of the client from the placement. Prior to the renewal of such an agreement, the Defendants or their agents will monitor the service provider's compliance with the terms of the agreement.

26. Contracts for residences and services will be available for inspection by parents, guardians and advocates of members of the plaintiff class.

27. The Defendants will provide or continue to provide all residents and clients with a written Individual Program Plan which specifies in detail the individual's capabilities and needs for services, including the methods to be utilized to provide such services. The Individual Program Plan will address the individual's residential and nonresidential program needs, with particular emphasis on the determination of the least restrictive residential environment and suitable nonresidential treatment, training, and support services appropriate to meet those needs. The Individual Program Plan will describe short-term and long-term program goals and timetables for the attainment of these goals. The Individual Program Plan will identify by name the person or persons who are primarily responsible for implementing, and overseeing implementation of, service goals.

28. The Individual Program Plans will be developed under the direction of a qualified professional and will be reviewed at least annually by an interdisciplinary team which is appropriately constituted in accordance with professionally acceptable standards and which includes the person or persons primarily responsible for the daily care and support of the resident or client, as well as the community service coordinator or manager responsible for the client. Each resident or client, and the individual's guardian, advocate or other representative will be notified of and invited to participate in the interdisciplinary team meeting, unless the resident or client objects to such attendance. Notification of team meetings will be provided as far in advance as practicable, and in no event less than two (2) weeks prior to the meeting. In cases of emergency, such meetings may be held with less than two (2) weeks prior notice, provided that the resident or client, and the guardian, the advocate or designated representative and the Master are given the best practicable notice under the circumstances and provided further that an emergency shall mean a situation requiring immediate attention because of a change in the client's situation.

29. The resident's or client's community service coordinator or manager will be responsible for reviewing and monitoring the client's progress, for ascertaining that appropriate services are being delivered, and for coordinating the input of other professionals and staff in the Individual Program Plan process. Each such community service coordinator's or case manager's caseload will not exceed twenty-five (25) persons.

30. The resident or client or his/her representative may at any time initiate a request for transfer to a more appropriate setting. The Department of Mental Health will respond within thirty (30) days, either accepting or rejecting the request and stating the reasons for any rejection. A request for such a transfer will be rejected only because continuation in the current residence offers the individual a better opportunity for personal development in a more suitable environment or because a placement is not currently available elsewhere. In this latter situation the resident or client will be transferred as soon as an appropriate placement can be found or developed. A request for transfer which has been denied may not be renewed for six (6) months unless the person requesting the transfer can demonstrate that there has been a material change in the client's circumstances or significant new evidence has been discovered.

## PERSONNEL AND TRAINING

31. The Defendants will establish standards for staff of community residential and nonresidential programs which are designed to screen out those applicants for employment who might pose a danger to clients or who fail to work in their best interests. Defendants will have six (6) months to develop the standards. Plaintiffs will be allowed to review the standards developed and to comment on same. Thereafter, adherence to the standards will be required in all new contracts for all new employees.

32. The Defendants will provide all new and present Department of Mental Health Employees engaged in carrying-out this Decree with appropriate orientation and training programs to increase their skills and interest in achieving service goals for clients. The Defendants agree to provide staff persons employed in new residential and nonresidential programs with training appropriate to their tasks if adequate training is not otherwise provided.

33. Personnel policies will be designed to maximize use of individual employee skills and to enhance effective services for clients and working conditions for employees. Personnel policies will include provisions, consistent with state law, for suspending or terminating employees whose job performance is determined, after appropriate review, to be substantially unsatisfactory or to violate the rights of clients as set forth in relevant statutes, regulations or the provision of this Decree.

34. The Defendants agree to use their best efforts to secure federal funds to train and retrain individuals working in community programs. To the extent federal funds are inadequate for this purpose, the Defendants agree to provide by other means and to seek adequate funding for training personnel.

35. The Defendants will include in every future contract requiring an agent or independent contractor to perform duties, standards, and procedures which would otherwise be performed by the Defendants or their employees, a clause requiring the agent or contractor to meet the relevant obligations of this Decree.

## EVALUATION AND ENFORCEMENT

36. By September 1, 1979, an independent Master will be appointed by the Court from a list of proposed candidates jointly prepared by the parties. The Master will be responsible solely to the Court and will serve until the Decree has been fully implemented. The Master will review and report to the Court and the parties on the progress towards implementation of this Decree, in accordance with procedures and schedules to be agreed upon by the parties. The Master's first term of appointment will be for eighteen (18) months, which may be extended by agreement of the parties and the Court. The parties' attorneys will consult with each other prior to the reappointment or replacement of the Master. The Defendants will pay the salary and expenses of the Master and an assistant and will provide necessary clerical support. The Defendants will pay the costs and expenses of those consultants which the Master finds necessary to fulfill his/her responsibilities as set forth in this Decree. The parties will agree in advance on the total budget for the Master for fiscal year 1979–80. Thereafter, the Master will prepare proposed budgets for his/her salary, the salary of his/her assistant and clerical support and their expenses for each succeeding fiscal year. If the Defendants refuse to approve a budget submission, and there remains disagreement after discussion between the Master and the parties, the Master may apply to the Court for a resolution.

37. The Master will be allowed access to all information, records, residential environments, and program areas, and will be permitted to interview any person affected by or involved in the implementation of this Decree to the extent necessary to discharge the Master's duties under this Decree. To the extent any such information, regardless of form, is disclosed, it will be deemed by the parties to have been disclosed pursuant to Section 748(4)(a) and (d) of the Michigan Mental Health Code, Act 258 of 1974, M.C.

L.A. § 330.1748(4)(a) and (d); any such disclosures will be subject to the provisions of section 748(3) of the Michigan Mental Health Code, Act 258 of 1974; M.C.L.A. § 330.1748(3).

38. The Master will have authority to investigate and evaluate any community program, as well as services at the PCHD that relate to the habilitation of residents and placement in the community of members of the class, in order to monitor the implementation of this Decree. The Master will, to the extent practicable, make himself or herself available to the parties.

39. The Master may make informal suggestions to the Defendants in whatever form the Master deems appropriate in order to facilitate compliance with the Decree.

40. If an individual complaint or problem is not or cannot be resolved through existing procedures of the Department, any employee or agent of the Defendants, any resident or client, or any guardian, advocate, or other representative of a resident or client, may bring a situation or disagreement related to the provisions of this Decree to the attention of the Master for appropriate action. The Master will provide written notice of such matter to the parties' attorneys. The attorneys will have fifteen (15) days to attempt an informal resolution of the matter. If the matter cannot be resolved, the parties will have an additional seven (7) days to present their positions, in writing, to the Master. The Master's action on individual complaints or problems will be considered final, and inappropriate for review by this Court, except to the extent provided in paragraph forty-one (41) of this Decree.

41. The Master will have the authority to make recommendations with regard to implementation of the Decree if: (1) the Master believes that the Defendants are not in compliance with the Decree; (2) this belief is accompanied by written evidence upon which each finding is based; and (3) the recommendations are consistent with and can be implemented within the framework of the Decree. Such recommendations will include, where necessary, timetables for implementation of steps or measures to bring the Defendants into compliance.

a. Copies of each recommendation accompanied by the findings of fact required by this paragraph will be filed with the Court and sent to counsel for the parties. All parties shall be bound by the recommendation unless, within fifteen (15) days of receipt of any such recommendation any party files an objection with the Court and requests a hearing. Objections may be made on the basis that (1) the findings of fact relied upon by the Master are erroneous, (2) the Master's judgment of noncompliance is erroneous, or (3) the Master's recommendations are beyond the provisions of or inconsistent with the Decree.

b. The hearing on the objections will be held at the earliest convenient time after notice to all parties.

42. The Master will submit written reports to the Court and the parties every ninety (90) days on the progress achieved in complying with the provisions of this Decree, including a description of any problems which have arisen, any suggestions which the Master has made to the parties regarding resolution of those problems, and a description of any disputes resolved under the provisions of paragraph forty (40) herein. The reports will include names and addresses of all residents who have exited Plymouth Center during the ninety (90) day period, provided that this list will be physically separable from the rest of the report and will not be available for public inspection. The report shall also contain information relating to persons transferred to the PCHD from other Department of Mental Health facilities during such report period; with respect to each such transferred resident the report shall include his/her name, date of transfer and the name of the institution from which transfer occurred; such information shall be physically separate from the rest of the report and shall not be available for public inspection. Before filing his/her report the Master will submit a draft thereof to the parties for comment.

The parties will have fifteen (15) days to provide any written comments which they have, and these comments shall be submitted to the Court with such report. The Master may submit special reports to the Court and the parties at any time, and may have access to the Court as the Master deems necessary and appropriate without prior consultation with the parties.

43. The parties' counsel may apply to the Court for appropriate relief on matters of significant concern in the implementation of this Decree. The Master shall present his views on any matter so presented to the Court.

44. Defendants will post in each building at the PCHD, and will either post in or send to each community program where members of the Plaintiff class receive services, a notice that the Court has issued a judgment setting forth standards and procedures to be applicable to all the Plaintiffs. The Defendants will insure that a copy of that judgment is available for inspection at Regional Offices of the Department of Mental Health during regular business hours by employees and agents of Defendants, vendors and service providers, residents, clients and their parents, relatives, and legal guardians, and all other interested members of the public.

45. Within sixty (60) days of the entry of this Decree Defendants will present to the Court and the Plaintiffs a detailed plan for implementation of this Decree. Plaintiffs will have fifteen (15) days to submit any comments respecting said plan. Said plan shall identify the efforts that will be undertaken to monitor the provision of services needed by members of the Plaintiff class. Said plan shall also indicate efforts that will be undertaken to inform the parent(s), guardian(s) and advocate(s) of each member of the Plaintiff class, of the name of the person accountable for monitoring the safety and services provided each such member.

46. This Decree will terminate on December 31, 1984, unless a party petitions the Court to continue the effectiveness of the Decree for a further period, so that any remaining unresolved aspects of implementation of this Decree may be finally resolved, and the Court grants such petition.

So ordered.